UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
LUDINA ROSA,                                    :

               Plaintiff,            :          07 Civ. 9478 (GWG)

    -v.-                                     :          **OPINION AND ORDER**

MICHAEL J. ASTRUE,                              :
Commissioner of Social Security,
                            :
               Defendant.
------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

      Ludina Rosa, proceeding pro se, brings this action pursuant to 42 U.S.C. § 405(g) to

obtain judicial review of the final decision of the Commissioner of Social Security denying her

claim for Supplemental Security Income ("SSI") benefits.  The parties have consented to this

matter being determined by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

The Commissioner has moved to dismiss the complaint pursuant to Fed. R. Civ. P. 12(c).  For

the reasons stated below, the Commissioner's motion is granted.

I.      BACKGROUND

      A.     Administrative History

           1.     SSI Applications From 1981-1990

      Rosa applied for SSI benefits on July 29, 1981, alleging she was disabled due to heart

disease.  See Administrative Record (annexed to Answer, filed Sept. 22, 2008 (Docket # 11))

("R."), at 23.  On September 17, 1981, her application was denied because the Social Security

Administration ("SSA") found Rosa was not restricted in her work activities.  Id. at 33-35.  On

October 2, 1981, she made a request for reconsideration, which was denied.  Id. at 37-38.  She

made subsequent applications for benefits in April 1986, id. at 77-86, December 1986, id. at 130-

33, 152-57, and April 1989, id. at 183-86.  All these claims were denied, id. at 87-89, 134-36,

205-07, 210, 227-29.

An additional claim, made on June 1, 1990, was granted, although the benefits were not

retroactive.  Id. at 14.

            2.      1999 SSI Application

On June 7, 1995, Rosa was notified that she might be able to re-open her old claims as a

result of the Second Circuit's decisions in State of New York v. Sullivan, 906 F.2d 910 (2d Cir.

1990) and Dixon v. Shalala, 54 F.3d 1019 (2d Cir. 1995).  R. 283, 297-99.[1]  She filed an

additional application on October 19, 1999.  R. 297, 326-35.  Following re-opening, the claim

was denied again.  Id. at 309-10, 313.  Rosa requested a hearing before an Administrative Law

Judge ("ALJ"), which was held on March 1, 2002.  Id. at 493-509.

On May 21, 2002, the ALJ issued a decision in which he found that, prior to October 1,

1986, Rosa retained residual functional capacity to perform light work, including the ability to

lift and carry up to ten pounds frequently and twenty pounds occasionally.  Id. at 15.

Additionally, the ALJ found that, during that period, Rosa could sit, stand, and walk for 6 hours

in an 8-hour workday.  Id. at 15.  He noted that she had no past relevant work experience and

that she spoke no English.  Id. at 17.  However, because Rosa had the residual functional

capacity to perform nearly all of the seven primary strength demands required by work, the ALJ

---

[1] Sullivan allowed certain claimants to reopen their pre-Sullivan cases where the denial of benefits was based solely on the use of a treadmill exercise test.  See generally Sullivan, 906 F.2d 910.  Dixon found that the SSA had misapplied the severity analysis, discussed in part II.B below, and allowed the re-opening of claims made between June 1, 1976 and July 19, 1983.  See Dixon, 54 F.3d at 1031-36; Fagan v. Astrue, 2008 WL 4703230, at *15-16 (S.D.N.Y. Sept. 2, 2008).

concluded that she was not disabled prior to October 1, 1986.  See id. at 17-18 (citing S.S.R.

83-10, 1983 WL 31251 (S.S.A. Nov. 30, 1982)).  Thus, the ALJ found that Rosa was not

disabled from July 29, 1981 through September 30, 1986.  Id. at 15, 18, 21.

By contrast, the ALJ found that Rosa was eligible for SSI benefits from October 1, 1986

through May 31, 1990.  The ALJ found that Rosa's additional limitations occurring after October

1, 1986, including her mental health problems, were disabling and rendered her unable to work.

Id. at 20, 22.

Rosa sought review of this decision and the Appeals Council denied her request for

review on May 2, 2007.  Id. at 6A.

B.     The Instant Lawsuit

On October 24, 2007, Rosa filed a complaint with this Court.  See Complaint, filed Oct.

24, 2007 (Docket # 2) ("Compl.").  The Commissioner moved to dismiss the complaint pursuant

to Fed. R. Civ. P. 12(c) on September 24, 2008.  See Notice of Motion, filed Sept. 24, 2008

(Docket # 13); Memorandum of Law in Support of Defendant's Motion for Judgment on the

Pleadings, filed Sept. 24, 2008 (Docket # 14).  Rosa filed no papers in opposition to the motion.[2]

C.     Rosa's Testimony

At the hearing in March 2002, Rosa testified through an interpreter that she was born in

1936, though she had previously believed that she was born in April 1937.  R. 497.  She came to

New York from Puerto Rico when she was 14.  Id. at 503.  She worked when she first arrived in

---

[2] The Commissioner had previously moved to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).  See Notice of Motion, filed Feb. 4, 2008 (Docket # 5); Memorandum of Law in Support of Defendant's Motion for Judgment on the Pleadings, filed Feb. 4, 2008 (Docket # 6).  That motion was denied.  See Memorandum Endorsement, filed June 24, 2008 (Docket # 10).

New York, but had not worked since she married in 1954.  Id. at 504.  She had 9 children and 12 grandchildren.  Id. at 506-07.

Rosa was receiving SSI benefits as of June 19, 1990.  Id. at 498.  Between 1978 and 1990, she had been seen at Lincoln Hospital and Courtlandt Medical Group.  Id. at 504.  During that period she suffered from problems with her right shoulder, high blood pressure, angina, and sinusitis.  Id. at 505.  She was taking medications in 1980.  Id.

She was once treated by Dr. Herbert Rabener in Elmhurst, New York, but could not recall seeing him in the ten years prior to the hearing.  Id. at 505-06.  In 1978, she had seen a psychiatrist at Lincoln Hospital.  Id. at 506.

D.       Information From Prior Applications

On July 29, 1981, Rosa filed an application for disability in which she stated that she gets dizzy, faints often, has blackouts and suffers from a lot of pain.  Id. at 39.  She indicated that she received help from her daughter with household maintenance because Rosa's conditions keep her from exerting herself.  Id. at 42.  She indicated that she sometimes would visit her son outside New York using a railroad, but usually people visited her.  Id.  She could use public transportation, but did not travel much.  Id.  That same day, an SSA representative interviewed Rosa and noted that Rosa had no trouble reading, writing, answering, or understanding, and that she was cooperative but that she had a "low fund of general information."  Id. at 46.  As an example, the representative noted that Rosa did not know what town her son lived in.  Id.

The application was denied, and on October 2, 1981, Rosa filed a request for reconsideration in which she indicated that her blood pressure had worsened and that she had "terrible headaches" and dizzy spells, id. at 47.  She also wrote "none" in the box that asked her

4

to describe the physical or mental limitations resulting from her conditions.  Id.  Elsewhere in the application, Rosa noted that she could not go out alone because of the dizzy spells.  Id. at 49. That same day, a social security representative observed that Rosa had no trouble reading, writing, answering, or understanding.  Id. at 51.

In her 1986 application, Rosa noted that she had hypertension, angina, and arthritis.  Id. at 90.  She also noted that she did household maintenance as best she could.  Id. at 93.

E.      Medical Evidence Prior to October 1, 1986

On July 28, 1981, a cardiologist from Courtlandt Diagnostic Medical and Dental (whose name is illegible) wrote a note stating that Rosa could not work and was disabled due to "longstanding hypertension and hypertensive cardiovascular disease."  Id. at 53.

On August 25, 1981, Rosa was examined by Dr. David Pulver.  Id. at 55.  He reported that Rosa stated she experienced shortness of breath after climbing two sets of stairs.  Id.  She experienced pin-like "chest pain that is located substernally" and that would last several seconds. Id.  The pain would typically occur at night and at rest, and occasionally radiate to her back.  Id. She also sometimes experienced swollen legs.  Id.  On examination, she had blood pressure of 120/70.  Id.  She had a point of maximal impulse at the fifth left intercostal space.  Id. at 56.  No murmur or gallop was detected.  Id.  Her eyes, ears, nose and throat were normal.  Id.  The examination revealed no rales, rhonchi, or wheezing.  Id.  The diagnostic impression was hypertension, osteoarthritis and chest pain, but Dr. Pulver "doubt[ed] cardiac etiology" with regards to the chest pain.  Id.  Dr. Pulver opined that, during an 8-hour work day, Rosa could sit between 6 and 8 hours, and stand or walk for 6 hours.  Id. at 59.  Additionally, he stated that she could lift or carry 20 pounds occasionally and 10 pounds frequently.  Id.  Further, she could

occasionally bend, squat, crawl, or climb.  Id.

Also on that date, Rosa underwent exercise tolerance testing.  Id. at 61.  The test showed a normal heart rate at rest, and a normal response to exercise.  Id.  The test was discontinued because of fatigue, but the examining physician felt it was a "normal submaximal exercise tolerance test."  Id.  A chest x-ray taken at this time appeared normal for a woman of Rosa's age and habits, other than a cardiac to thoracic ratio of 14.0cm to 24.0cm.  Id. at 74.  The x-ray report concluded that there was an "[i]ncrease in traverse cardiac diameter."  Id.

On September 17, 1981, an SSA examiner assessed Rosa's claim based on evidence in the record.  Id. at 33-35.  The examiner noted that the medical record showed "creatinine, the treadmill [test], and chest x-ray are within normal limits.  Blood pressure is 120/70."  Id. at 35.  Additionally, the examiner indicated there was no observed "edema, joint deformity, tenderness or stiffness."  Id.  The examiner concluded that "[t]hese impairments do not restrict work related activities" and thus denied Rosa's claim.  Id.

October 1, 1981, the same cardiologist from Courtlandt Diagnostic Medical and Dental who wrote the July 28, 1981 note wrote another note stating that Rosa suffered from "hypertension and hypertensive heart disease, angina pectoris, and sinusitis," and was "permanently disabled from working."  Id. at 344.

On October 31, 1985, Rosa went to the Lincoln Medical and Mental Health Center in Bronx, New York, and told them that her son had died that morning.  Id. at 175.  The examiner stated that Rosa was crying, though oriented and cooperative.  Id.  Rosa was diagnosed with anxiety and referred for a psychiatric consultation.  Id.  At the referral, the psychiatrist observed that Rosa's speech was "clear, coherent and relevant."  Id. at 176.  She had an intense affect but

6

this was appropriate for her situation.  Id.  The psychiatrist concluded this was "uncomplicated

bereavement."  Id.

On November 3, 1985, Rosa went to the Lincoln Medical Center emergency room with

complaints of chest pain.  Id. at 174.  The pain did not radiate and Rosa was not sweating.  Id.

She was crying, and noted that her son had committed suicide "3 days back."  Id.  She was

discharged in "good condition."  Id.

On March 31, 1986, a Courtlandt Medical doctor, whose speciality is not identified,

indicated that Rosa had been seen since 1978 for (1) moderate hypertension, (2) arteriosclerotic

heart disease and cardiomegaly, (3) anginal episodes, (4) severe osteoarthritis, and

(5) intermittent dyspnea.  Id. at 114.  It indicated that she was "taking [a] full dose of medicine."

Id.

On June 10, 1986, Rosa was examined for the SSA by Dr. Joseph Tibaldi.  Id. at 104-06.

Rosa indicated to him that she had a history of an enlarged heart and that she was taking

Nitroglycerin, Inderal, and Dalmane.  Id. at 104.  She complained of headaches, dizziness, and

shortness of breath when she walked two blocks or more.  Id.  She had "chest pain three times a

day, lasting three minutes."  Id.  This pain occurred whether or not she was resting, and felt like

"a knife like sensation over the sub sternum with radiation to the right upper extremity."  Id.  She

also had difficulty breathing and sweated during these periods.  Id.  She would rest and take

Nitroglycerin to relieve the pain.  Id.  She reported being hospitalized in Prospect Hospital in

1982 for one week for hypertension.  Id.

On examination, Dr. Tibaldi found Rosa's blood pressure was 150/90, and she had

normal speech, hearing, and gait.  Id. at 105.  He found she had a "hysterical personality with a

7

low pain tolerance, complaining that everything hurts." Id.  The neurological review showed normal muscle strength, sensation, and vibration.  Id.  Her lungs were clear to percussion and auscultation, and he observed no rales, rhonchi, or wheezes.  Id.  She had a decreased range of motion of her lumbar spine to 70 degrees of flexion, decreased straight leg raising bilaterally to 45 degrees, decreased range of motion of the right and left hips to 80 degrees of flexion with pain, and decreased range of motion of the right and left knees to 130 degrees of flexion with pain.  Id.  She had full range with her remaining joints.  Id.  She had no paravertebral spasm.  Id.  Review of a chest x-ray revealed minimal cardiomegaly.  Id. at 106.  A right knee x-ray returned normal and a right hand x-ray showed minimal degenerative changes.  Id.  An electrocardiogram ("EKG") showed "regular sinus rhythm with left axis deviation" and nonspecific ST-T wave changes.  Id.  Pulmonary function testing was consistent with minimal restrictive changes.  Id.  The doctor's diagnosis was (1) hysterical personality, (2) arthritis, and (3) chest pain that was "probably not secondary to atherosclerotic heart disease."  Id.

On July 1, 1986, Dr. B. Marasigan of the New York State Office of Disability Determinations suggested performing a stress test to evaluate Rosa.  Id. at 115.

In July 25, 1986, a consultive examination was performed for the SSA by Dr. Anjani Bhatt, M.D.  Id. at 119-29.  An EKG showed "regular sinus rhythm at the normal axis" and nonspecific ST-T wave changes.  Id. at 119.  No changes were seen in the post-hyperventilation and deep breath tracings.  Id.  The treadmill test lasted only a minute because Rosa complained of chest pain.  Id.  The pain was sharp in her chest and radiated to her arm.  Id. at 121.  This pain lasted 4 minutes and was relieved by rest.  Id.  After the treadmill test, Rosa's blood pressure was 126/74.  Id. at 119.  Examination showed no changes to heart and lungs.  Id.

On August 7, 1986, Rosa had a consultive examination performed for the SSA by Dr. A. Kovary. Id. at 117.  Dr. Kovary concluded that Rosa had no limitations in her capacity to lift, carry, stand, sit, push, or pull.  Id.[3]

II.    LAW GOVERNING REVIEW OF SOCIAL SECURITY CLAIMS

Claims arising under the Social Security Act for SSI benefits are governed by 42 U.S.C. §§ 405(g) and 405(h), as incorporated by 42 U.S.C. § 1383(c)(3).  Section 405(g) provides that an "individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, . . . may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Commissioner may allow."   Section 405(g) is the exclusive remedy for seeking review of a final decision of the Commissioner.  See 42 U.S.C. § 405(h) ("No findings of fact or decision of the Commissioner of Social Security shall be reviewed by any person, tribunal, or governmental agency except as herein provided.").

A.    Scope of Judicial Review under 42 U.S.C. § 405(g)

A court reviewing a final decision by the Commissioner must determine whether the Commissioner has applied the correct legal standard and whether the decision is supported by

---

[3]  The record also contained evidence regarding Rosa's condition beginning in October 1, 1986.  A social worker connected to Lincoln Medical and Mental Health Center indicated in a handwritten note that Rosa had been an outpatient with the psychiatric clinic since October 1, 1986, where Rosa was seen every three weeks. Id. at 167.  Rosa was being treated with Benadryl and individual psychotherapy. Id.  She was diagnosed with atypical depression, and it was noted that she had made a suicide attempt.  Id.; see also id. at 463 (same). On January 13, 1987, the social worker and a psychiatrist affiliated with Lincoln Hospital wrote a psychiatric medical report that indicated Rosa was "experiencing auditory and visual hallucinations as well as insomnia and crying spells." Id. at 170.  It noted that Rosa was being treated with Benadryl and individual psychotherapy. Id.  Later medical records reflected both psychiatric and coronary problems.

substantial evidence.  See, e.g., Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008); Acierno v. Barnhart, 475 F.3d 77, 81 (2d Cir.) (citing Pollard v. Halter, 377 F.3d 183, 188 (2d Cir. 2004)), cert. denied, 127 S. Ct. 2981 (2007); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); see generally 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive.").  "Substantial evidence" is "'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); accord Burgess, 537 F.3d at 127-28; Matthews v. Leavitt, 452 F.3d 145, 152 n.9 (2d Cir. 2006); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000).

If the reviewing court finds substantial evidence to support the Commissioner's final decision, that decision must be upheld, even if substantial evidence supporting the claimant's position also exists.  See generally Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder.") (citation omitted).  "The role of the reviewing court is therefore 'quite limited and substantial deference is to be afforded the Commissioner's decision.'"  Hernandez v. Barnhart, 2007 WL 2710388, at *7 (S.D.N.Y. Sept. 18, 2007) (quoting Burris v. Chater, 1996 WL 148345, at *3 (S.D.N.Y. Apr. 2, 1996)).  The reviewing court may not substitute its judgment for that of the Secretary; further, it may reverse the administrative determination "only when it does not rest on adequate findings sustained by evidence having 'rational probative force.'"  Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988) (quoting Consol. Edison Co., 305 U.S. at 230).

10

B.    <u>Standard Governing Evaluation of Disability Claims by the Agency</u>

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A person will be found to be disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  § 423(d)(2)(A).

To evaluate a Social Security claim, the Commissioner is required to examine: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience."  <u>Mongeur v. Heckler</u>, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam) (citations omitted).

Regulations issued pursuant to the Social Security Act set forth a five-step process that the Commissioner must use in evaluating a disability claim.  <u>See</u> 20 C.F.R. § 404.1520(a)(4); <u>see also</u> <u>Burgess</u>, 537 F.3d at 120 (describing the five-step process); <u>Curry v. Apfel</u>, 209 F.3d 117, 122 (2d Cir. 2000) (same).  First, in evaluating the claim, the Commissioner must determine whether the claimant is currently engaged in any "substantial gainful activity."  20 C.F.R. § 404.1520(a)(4)(i).  Second, if the claimant is not engaged in substantial gainful activity, the Commissioner must decide if the claimant has a "severe medically determinable physical or mental impairment," § 404.1520(a)(4)(ii), which is an impairment or combination of

11

impairments that "significantly limits [the claimant's] physical or mental ability to do basic work activities," § 416.920(c).  Third, if the claimant's impairment is severe and is listed in 20 C.F.R. Part 404, Subpt. P, App. 1, or is equivalent to one of the listed impairments, the claimant must be found disabled.  § 404.1520(a)(4)(iii).  Fourth, if the claimant's impairment is not listed and is not equal to one of the listed impairments, the Commissioner must review the claimant's residual functional capacity to determine if the claimant is able to do work he or she has done in the past, i.e., "past relevant work."  § 404.1520(a)(4)(iv).  If the claimant is able to do such work, he or she is not disabled.  Id.  Finally, if the claimant is unable to perform past relevant work, the Commissioner must decide if the claimant's residual functional capacity permits the claimant to do other work.  § 404.1520(a)(4)(v).  If the claimant cannot perform other work, he or she will be deemed disabled.  Id.  The claimant bears the burden of proof on all steps except the final one – that is, proving that there is other work the claimant can perform.  Curry, 209 F.3d at 122.

A court may not "affirm an administrative action on grounds different from those considered by the agency."  Burgess, 537 F.3d at 128 (quoting Melville v. Apfel, 198 F.3d 45, 52 (2d Cir. 1999)).

C.     Treating Physician Rule

In determining whether a claimant is disabled, a treating physician's opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence."  20 C.F.R. § 404.1527(d)(2).  Under this rule, the Commissioner is not required to give deference to the treating physician's opinion where the treating physician "issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts."

Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004); accord Burgess, 537 F.3d at 128.

Moreover, "the less consistent that [a treating physician's] opinion is with the record as a whole, the less weight it will be given." Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999). "Genuine conflicts in the medical evidence are for the Commissioner to resolve." Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002). Nonetheless, "not all expert opinions rise to the level of evidence that is sufficiently substantial to undermine the opinion of the treating physician." Burgess, 537 F.3d at 128. Thus, an expert's opinion cannot overcome that of a treating physician where "the expert addressed only deficits of which the claimant was not complaining," where the expert relies solely on a non-medical expert's evaluation, or where the expert's opinion is "so vague as to render it useless in evaluating the claimant's residual functional capacity." Id. at 128-29 (internal citations and quotation marks omitted).

III.   DISCUSSION

A.   Substantial Evidence

Because the ALJ determined that Rosa met the requirements of the first four steps of the inquiry used to determine whether she was disabled, R. 17, the only issue relates to the fifth step: whether the ALJ correctly determined that SSA met its burden in proving that there was other work Rosa could have performed prior to October 1, 1986.

In finding that Rosa had the capacity to find such work, the ALJ determined that Rosa could still perform light work.[4] R. 21. In making this determination, the ALJ relied in part on

---

[4] Under SSA guidelines, "[l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 416.967(b).

the consultative examination performed by Dr. David Pulver in which Dr. Pulver concluded that

Rosa could lift 10 pounds regularly and 20 pounds occasionally.  Id. at 16; see also id. at 55-56,

59-60.  Dr. Pulver's conclusions were in turn supported by an examination of Rosa as well as an

x-ray report, an EKG, and an exercise tolerance test.  See id. at 16; see also id. at 55-74.  Thus,

there was significant medical evidence on which to base a conclusion that Rosa could perform

light work.

Further, as the ALJ correctly noted, the medical vocational guidelines indicate that

individuals of Rosa's profile will not be considered disabled.  Id. at 18; see 20 C.F.R. Part 404,

Subpt. P, App. 2, § 202.16 (2003) (an unskilled younger individual (18-49) who cannot speak

English, but who can perform light work, is not considered disabled); see also Rosa v. Callahan,

168 F.3d 72, 78 (2d Cir. 1999) ("In the ordinary case, the Commissioner meets his burden at the

fifth step by resorting to the applicable medical vocational guidelines.") (internal citations and

quotation marks omitted).  As a result, the ALJ had a basis for determining that an individual

with Rosa's limitations had sufficient residual functional capacity to obtain work, and thus the

ALJ had sufficient basis to support a finding that Rosa was not disabled.

B.      Treating Physician Rule

While the ALJ recognized that there were two notes from a cardiologist indicating that

Rosa was disabled and unable to work, the ALJ also noted that this assessment was made

without a description of specific limitations or diagnostic testing.  R. 17.  Thus, the ALJ found

Dr. Pulver's assessment of Rosa's limitations more persuasive.  Id.  Given the amount of

evidence indicating a lack of limitation during the relevant period, a genuine conflict existed as

to how the evidence should be interpreted, and that conflict was for the Commissioner to resolve.

14

See Veino, 312 F.3d at 588.  Dr. Pulver's conclusion that Rosa was not disabled was consistent with other evidence in the record, including the reports of Dr. Joseph Tibaldi and Dr. Anjani Bhatt, and the conclusion of consultative physician Dr. Kovary.  Thus, the ALJ acted within his discretion when he declined to give controlling weight to the opinion of Rosa's treating physician.

Conclusion

For the foregoing reasons, the Commissioner's motion to dismiss (Docket # 13) is granted.  The Clerk is requested to enter judgment.

SO ORDERED.

Dated: March 23, 2009
       New York, New York


_____
GABRIEL W. GORENSTEIN
United States Magistrate Judge

Copies to:

Ludina Rosa
2811 Exterior Street, #11B
Bronx, NY 10463-7125

Susan D. Baird
Assistant United States Attorney
86 Chambers Street, 3rd floor
New York, NY 10007

See Veino, 312 F.3d at 588.  Dr. Pulver's conclusion that Rosa was not disabled was consistent

with other evidence in the record, including the reports of Dr. Joseph Tibaldi and Dr. Anjani

Bhatt, and the conclusion of consultative physician Dr. Kovary.  Thus, the ALJ acted within his

discretion when he declined to give controlling weight to the opinion of Rosa's treating

physician.

Conclusion

     For the foregoing reasons, the Commissioner's motion to dismiss (Docket # 13) is

granted.  The Clerk is requested to enter judgment.

SO ORDERED.

Dated:  March 23, 2009
       New York, New York

                                   GABRIEL W. GORENSTEIN
                                   United States Magistrate Judge

Copies to:

Ludina Rosa
2811 Exterior Street, #11B
Bronx, NY 10463-7125

Susan D. Baird
Assistant United States Attorney
86 Chambers Street, 3rd floor
New York, NY 10007